**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| FABIEN BAEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2020 CV 7402 |
| | ) | |
| The CITY OF CHICAGO, a municipal | ) | Judge |
| corporation and Unidentified Chicago | ) | |
| Police Officers, | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

FABIEN BAEZ, by and through his attorneys, The Hamilton Law Office, LLC, makes the following complaint against Defendants CITY OF CHICAGO, Illinois ("Defendant CITY") and Unidentified Chicago Police Officers ("Defendant OFFICERS"):

### JURISDICTION and VENUE

1. This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

2. This Court has jurisdiction over the action pursuant to 28 U.S.C. §§1331, 1343, and 1367.

3. Venue is proper under 28 U.S.C. §1391(b). The events giving rise to the claims asserted in this complaint occurred within this district.

### PARTIES

4. FABIEN BAEZ ("Baez") is a 23-year-old resident of Chicago, Illinois.

5. At all relevant times, Defendant OFFICERS are or were Chicago police officers, employed by Defendant CITY, acting under color of law and within the scope of their employment.

6. Defendant CITY is a municipal corporation duly incorporated under the laws of the State of Illinois, and was at all relevant times the employer and principal of Defendant OFFICERS. Should Plaintiff prevail on their claims, Defendant CITY is liable to Plaintiff as the principal on

their state law claims pursuant to the doctrine of *respondeat superior*, and must indemnify

Defendant OFFICERS on Plaintiff's federal claims pursuant to 745 ILCS 10/9-102.

**May 30, 2020 Chicago Protest**

7. On May 25, 2020 George Floyd was murdered by Minneapolis police officers.

8. Floyd's death sparked mass protests a across the United States, including in Chicago, Illinois, regarding the long-standing mistreatment of people of color by law enforcement in the United States.

9. On May 30, 2020 there was an organized protest in Chicago on the Wabash Avenue bridge in the Loop regarding George Floyd's murder.

10. On May 30, 2020 Baez attended the protest on the Wabash Avenue bridge.

11. Baez attended the protest to show his support for the Black Lives Matter movement and to protest George Floyd's murder at the hands of law enforcement.

12. At approximately 6:30 p.m., Baez was near a line of police officers on the north end of the Wabash Avenue bridge.

13. Baez was photographing the protest with his back turned to the line of police.

14. Baez was not doing anything illegal.

15. Approximately 5 to 6 Defendant OFFICERS tackled Baez and began hitting him with batons, causing bruising and abrasions to his buttocks and knee.

16. Defendant OFFICERS broke Baez's glasses, camera, and camera lens.

17. Defendant OFFICERS handcuffed Plaintiff's' hands behind his back, using thick, plastic handcuffs.

18. Defendant OFFICERS put the plastic handcuffs on Plaintiff unreasonably tight, causing pain and abrasions to Plaintiff's wrists.

19. Plaintiff asked Defendant OFFICERS to loosen the handcuffs but Defendant OFFICERS ignored him.

20. Defendant OFFICERS took Plaintiff to a police staging area near the Trump Tower and detained him there.

21. After approximately an hour, Defendant OFFICERS put Baez into a police vehicle with a number of other arrestees.

22. Baez was transported to the police station at Harrison and Kedzie.

23. Baez was detained at the Harrison and Kedzie police station for several hours.

24. Baez was eventually released without any criminal charges.

25. Before May 30, 2020, Plaintiff had ever been arrested before.

**The Chicago Police Department's Long History of
Unconstitutional Treatment of Protestors**

26. The City's long-standing policies, practices and customs relating to protests are the direct and proximate cause of the unconstitutional violations outlined in this Complaint.

27. For decades, the Chicago Police Department ("CPD") has used unjustified force against and unlawfully detained people exercising their right to peaceably assemble and protest.

28. In 1968, uprisings occurred following the assassination of Martin Luther King, Jr. In response, the CPD first used tear gas on protesters and then was later instructed to use more aggressive action.

29. Police violence against protesters continued throughout 1968, most memorably during the Democratic National Convention. For example, Chicago police officers cornered and tear-gassed a large crowd of protesters outside the Conrad Hilton Hotel. Several other individuals were attacked and beaten with batons by Chicago police officers. In total, over 500 protesters and 100 civilians reported injuries from tear gas.

30. In response to the Black Freedom and anti-war protests in Chicago and around the country, President Johnson established the National Commission on the Causes and Prevention of Violence through Executive Order 11412. This Commission was responsible for investigating and making recommendations regarding the "causes and prevention of lawless acts of violence in our society…and the causes and prevention of disrespect for law and order…and of violent disruptions of public order by individuals and groups."

31. The Commission did a deep dive into the CPD's reaction to the uprisings in 1968 and issued a special sub report focusing exclusively on Chicago. That report concluded that CPD responded to the protests with "unrestrained and indiscriminate violence on many occasions," often inflicted upon "peaceful demonstrators, onlookers, and large numbers of residents who were simply passing through, or happened to live in, the areas where confrontations were occurring."

32. On December 29, 1990, protesters speaking out against the Gulf War gathered near the Aragon Ballroom in the Uptown neighborhood, following a concert by musical acts Public Enemy and Sonic Youth. Plain-clothed Chicago police officers struck protesters in the face, placed them in choke-holds, and conducted false arrests against bystanders opposing their conduct and concert-goers simply leaving the venue.

33. In August of 1996, activists protesting outside the Democratic National Convention were falsely arrested and injured by Chicago police officers. More than half a dozen plaintiffs brought an excessive force and false arrest lawsuit that the City settled for substantial money damages.

34. On March 20, 2003, a mass demonstration and march against the War in Iraq began at the Federal Plaza in Chicago. Towards the end of the demonstration, Chicago police officers trapped over 800 protesters and by-standers on Chicago Avenue between Michigan Avenue and Mies Van Der Rohe Way without giving people orders to disperse and opportunities to leave.

Chicago police officers prevented the marchers and others from leaving the area, despite numerous requests by individuals to do so.

35. In addition to confining and arresting the 2003 crowd, Chicago police officers engaged in excessive force which included storming into the crowd and striking people with batons. Several women were assaulted after they sat down on the ground to indicate to the CPD that they were peaceful and non-violent. Other individuals were intentionally handcuffed too tightly with the plastic flex cuffs which caused many wrist injuries and pain.

36. Of the 500-plus people taken into custody, 224 were subsequently released without charges because the CPD could not specifically identify who arrested them.

37. A federal civil rights class action was filed against the City of Chicago and CPD personnel alleging that those arrested were seized in violation of their rights to free speech, assembly, and liberty guaranteed by the First, Fourth, and Fourteenth Amendments and Illinois law, and that the City of Chicago was liable under *Monell v. N.Y.C. Dept. of Soc. Serv.*, 436 U.S. 658 (1978). Additionally, claims for excessive force, battery, and the denial of adequate medical care were brought on behalf of seven individual plaintiffs.

38. The Seventh Circuit, in a unanimous opinion, ruled in favor of the Class plaintiffs, denying the City and Chicago police defendants summary judgment on plaintiffs' constitutional claims. See *Vodak v. City of Chicago*, 639 F.3d 738, 745-746 (7th Cir. 2011).

39. After the Seventh Circuit remanded the case to the District Court, the entire case was settled and resolved. Ultimately, the case cost the taxpayers of the City of Chicago approximately $15 million, with the plaintiffs receiving over $6.4 million in settlement awards. Around $9 million was paid to attorneys for the plaintiffs and outside counsel hired by the City to defend the CPD and City in fees and costs.

40. In 2015, the United States Department of Justice ("DOJ") documented the racist, biased, and anti-protester views held by many Chicago police officers who often express discriminatory views on social media. One officer posted two graphic photos of slain Black men with the caption: "Hopefully one of these pictures will make the black lives matter activist organization feel a whole lot better!" The DOJ found that supervisors posted many of the discriminatory posts it analyzed.

### The Chicago Police Department's Long History of Using Excessive Force and Covering Up and Condoning Police Misconduct to Shield its Officers

41. The Chicago City Council has long been aware of the regulatory, supervisory, and disciplinary failures plaguing the Chicago Police Department. At an October 2007 meeting of the Council's Committee on the Budget and Government Operations, a Council member remarked of the Office of Professional Standards ("OPS") that "there is no follow-up [of citizen complaints], and I think we have to move beyond the code of silence and the protection of the police officers and command staff at any cost."

42. The Chicago City Council subsequently enacted an ordinance in 2007 to replace OPS with the Independent Police Review Authority ("IPRA"), primarily in response to Council and citizen concerns and complaints about how allegations of police misconduct were being investigated.

43. However, the five-year collective bargaining agreements entered into by the Fraternal Order of Police and the City of Chicago pre- and post-IPRA contained identical provisions preserving and protecting police power in disciplinary investigations: a Bill of Rights affording an accused officer the right to the full name of the complainant and the right to examine allegations before taking a stance regarding the charges; restrictions on the investigation of anonymous complaints; and limitations on the use of previous un-sustained complaints against the officer in subsequent disciplinary actions.

44. In addition, the Chicago Police Department has a long history of covering up police misconduct, including uses excessive force against people, and Defendant CITY has been aware of this widespread custom and practice for many years.

45. This "Code or Silence" and/or "Blue Shield," wherein the City of Chicago covers up and condones police misconduct to shield its officers, including dangerous officers that pose a threat to the public, such as Defendant OFFICERS, allows officers to act with impunity and to feel and act as though their acts of misconduct will go unpunished and will not be properly investigated.

46. The effect of such policy is that officers, including but not limited to Defendant OFFICERS, feel they can act with impunity and without fear of reprimand.

47. For example, on November 13, 2012, in the case of *Obrycka v. City of Chicago, et al.*, 07 CV 2372, a federal jury returned a verdict against Defendant CITY and former Chicago police officer Anthony Abbate, finding that Defendant CITY had a widespread, persistent custom or practice of covering up police misconduct, i.e., the Code of Silence.

48. The *Obrycka* case arose out of Abbate's severe beating of a female bartender while Abbate was off-duty and intoxicated.

49. Abbate and other Chicago police officers attempted to suppress and destroy surveillance camera video recordings of the attack and made threats against Obrycka and other employees of the bar where she worked in an effort to cover up Abbate's misconduct.

50. The *Obrycka* jury found that Defendant CITY's persistent widespread custom or practice was the moving force behind Abbate's conduct when he physically beat the plaintiff on February 19, 2007, and awarded the plaintiff in that case $850,000 in compensatory damages.

51. In August 2015 one police officer testified instructors at the CPD police academy repeatedly tell officers, "[W]e do not break the code of silence. Blue is Blue. You stick together. If something

occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

52. On December 9, 2015, former Chicago Mayor Rahm Emanuel delivered a speech to the City Council in which he admitted that a code of silence exists and has long existed within the Chicago Police Department.

53. Mayor Emanuel stated that this tendency to ignore, deny, or cover up the bad actions of police officers leads to a culture where extreme acts of abuse are more likely.

54. Mayor Emanuel also admitted that "[s]upervision and leadership in the police department and the oversight agencies that were in place failed," and that "[o]ur city has been down this road before."

55. Mayor Emanuel also stated that he intended to create a task force to examine these failures within IPRA that would reach back to at least 2007, well before the incident specified in this complaint.

56. In April 2016, the Mayor's "Police Accountability Task Force" supported the Mayor's statements that a code of silence or blue shield exists within the Chicago Police Department.

57. Specifically, the Mayor's Task Force concluded, among other things, that the code of silence is "institutionalized and reinforced by CPD rules and polices that are also baked into the labor agreements between the various police unions and the City."

58. The Mayor's Task Force also found that IPRA "investigations are riddled with structural, cultural and procedural problems that cast doubt on the intentions and integrity of the investigating agencies and the larger oversight system. Misconduct goes uninvestigated despite the availability of information about these incidents; investigations are hampered by

unreasonable and unjustified procedures; and the investigative agencies lack the resources and support to be effective, and show troubling signs of bias."

59. The Task Force found that the Chicago Police Department has "no dedicated system [that] exists to identify and address patterns or practices…" and "[s]ince its inception, IPRA has had the power to examine patterns of complaints when investigating misconduct, but has not exercised it."

60. The United States Department of Justice ("DOJ") undertook an investigation of the Chicago Police Department and released a report with its findings in January 2017.

61. The DOJ report found that the CPD engages in a pattern and practice of excessive force.

62. The DOJ report concluded that IPRA did not adequately investigate allegations of police misconduct. For example, the DOJ report found that IPRA sustained fewer than 2% of the 30,000 police misconduct complaints Defendant CITY received from 2011 to 2016.

63. The DOJ report also found that IPRA investigations were biased in favor of police officers accused of misconduct.

64. The DOJ report identified IPRA's biased investigative techniques, such as "questioning of officers [that] is often cursory and aimed at eliciting favorable statements justifying the officer's actions rather than seeking truth. Questioning is often marked by a failure to challenge inconsistencies and illogical officer explanations, as well as leading questions favorable to the officer."

65. The DOJ report also found that reports drafted by IPRA investigators at the conclusion of an investigation, known as "Summary Reports," "are often drafted in a manner favorable to the officer by omitting conflicts in testimony or with physical evidence that undermine the officer's justification or by exaggerating evidence favorable to the officer."

66. The DOJ report concluded that IPRA's deficiencies in investigating police misconduct "played a central role" in allowing patterns of police misconduct to persist.

67. As a result of the DOJ's investigation into the CPD, the City of Chicago entered into a consent decree with the state of Illinois to address CPD's pattern and practice of committing excessive force.

68. An Independent Monitoring Team ("IMT"), overseen by Judge Robert M. Dow, Jr., assesses the City and CPD's compliance with the Consent Decree in biannual reports. (Each report assesses a portion of the paragraphs of the Consent Decree and will assess all paragraphs at the end of three years.) The IMT has so far issued two reports with a clear trend across both: the City and CPD have failed to comply with the reform schedule. In the first report, the City and CPD failed to meet even preliminary compliance standards for 52 of 67 paragraphs of the Consent Decree. The City and CPD missed 37 of 50 deadlines. The City's record in the second report was no better. In that report, filed on June 18, 2020, the City and CPD missed 52 of 74 deadlines.

69. The City's non-compliance and missed deadlines bear directly on CPD's civil rights abuses at the recent protests. CPD failed to create adequate policies and procedures for use of force, impartial policing, and crisis intervention and failed to revise relevant use of force and accountability policies.

70. These systemic failures by the City of Chicago to impartially investigate allegations of excessive force and retaliation by its police officers; its failure to discipline its officers for improper uses of force and retaliation have contributed to the existence of a Code of Silence in the Chicago Police Department and in the City's investigative agencies. These failures by the City have encouraged officers like Defendant OFFICERS in their belief that they could publicly beat Plaintiff for doing nothing more than exercising his First Amendment right to peaceably assemble and protest.

## COUNT I
### (42 U.S.C. § 1983, Excessive Force)

71. Each of the preceding paragraphs is incorporated as if fully restated here.

72. As described above, the intentional conduct of Defendant OFFICERS towards BAEZ was objectively unreasonable under the circumstances, and constituted excessive force in violation of the Fourth Amendment to the United States Constitution.

73. One or more of Defendant Officers were aware of their fellow officer(s)' misconduct, had an opportunity to intervene to prevent harm to Plaintiff, but failed to do so.

74. As a direct and proximate result of this excessive force, BAEZ suffered damages, which will be proven at trial.

   **WHEREFORE,** Plaintiff prays for a judgment against Defendant OFFICERS in a fair and just amount sufficient to compensate him for the injuries he has suffered, plus punitive damages, as well as costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT II
### (42 U.S.C. § 1983, First Amendment Retaliation)

75. Each of the preceding paragraphs is incorporated as if fully restated here.

76. As more fully described above, BAEZ was exercising his First Amendment right to peaceably assemble and protest on May 30, 2020.

77. In retaliation for this, Defendants used excessive force on BAEZ and falsely arrested him.

78. Defendants' actions in punishing BAEZ for exercising his First Amendment rights deters him and others from exercising his First Amendment right to peaceably assemble and protest.

79. BAEZ's First Amendment activity was a motivating factor in Defendants' decision use excessive force upon him and falsely arrest him.

80. As a direct and proximate result of Defendants' misconduct, YUSUF and BAEZ suffered damages, which will be proven at trial.

**WHEREFORE**, Plaintiff prays for a judgment against Defendant OFFICERS in a fair and just amount sufficient to compensate him for the injuries he has suffered, plus punitive damages, as well as costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT III
### (42 U.S.C. § 1983, False Arrest)

81. Each of the preceding paragraphs is incorporated as if fully restated here.

82. As described above, Defendant OFFICERS arrested Plaintiff, or caused him to be arrested, without probable cause and legal justification to do so, in violation of the Fourth Amendment to the United States Constitution.

83. As a direct and proximate result of this illegal arrest, Plaintiff suffered a loss of liberty and other damages, which will be proven at trial.

**WHEREFORE,** Plaintiff prays for a judgment against Defendant OFFICERS in a fair and just amount sufficient to compensate him for the injuries they have suffered, plus punitive damages, as well as costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT IV
### (Policy Claim – Defendant CITY)

84. Each of the preceding paragraphs is incorporated as if fully restated here.

85. The misconduct of Defendant OFFICERS alleged above was undertaken pursuant to the policy and practice of Defendant CITY of Chicago.

86. As a matter of both policy and practice, Defendant CITY encourages the type of police misconduct at issue in this case by failing to train and/or discipline Chicago police officers, and by failing to fairly and impartially investigate allegations of police misconduct, and these failures constitute deliberate indifference.

87. The following of Defendant CITY's policies and persistent widespread customs and practices were the driving force behind Defendant OFFICERS' misconduct and caused serious harm to Plaintiff:

   a. The CITY of Chicago encourages its police department and investigative agencies to protect its police officers from accountability by allowing and fostering a "code of silence" in the Chicago police department.

   b. Using excessive force against protesters for engaging in protected speech and assembly and without justification.

   c. Falsely arresting protesters for engaging in protected speech and assembly.

   d. The CITY has failed to adequately retrain, supervise, and discipline officers for their misconduct.

   e. The CITY has failed to adequately and impartially investigate allegations of police misconduct.

   f. The CITY has failed to adequately train, retrain, and supervise officers on de-escalation tactics and strategies.

88. These policies, practices, or customs of Defendant CITY individually and collectively, have been maintained and/or implemented with deliberate indifference by Defendant CITY, encouraging and allowing Defendant OFFICERS to commit the wrongful acts against Plaintiff, and therefore acted as the direct and proximate cause of the injuries sustained by Plaintiff.

89. These policies, practices, or customs of Defendant CITY, individually and/or collectively, were the moving force behind Defendant OFFICERS' conduct, depriving Plaintiff of his rights under the United States Constitution.

   **WHEREFORE,** Plaintiff prays for a judgment against Defendant CITY in a fair and just amount sufficient to compensate him for his damages, as well as declaratory and injunctive relief, acknowledging that the City has engaged in the unconstitutional practices alleged by Plaintiff and enjoining it from continuing these practices in the future, as well as such other relief as is just and equitable.

## COUNT V
### (Illinois Battery Claim)

90. Each of the preceding paragraphs is incorporated as if fully restated here.

91. As described above, Defendant OFFICERS willfully and wantonly and without legal justification used physical force upon Plaintiff.

92. As a direct and proximate result of Defendant OFFICERS' intentional misconduct, Plaintiff suffered damages, which will be proven at trial.

   **WHEREFORE,** Plaintiff prays for a judgment against Defendant CITY in a fair and just amount sufficient to compensate him for his damages and such other relief as is just and equitable.

## COUNT VI
### (Illinois False Imprisonment Claim)

93. Each of the preceding paragraphs is incorporated as if fully restated here.

94. As more fully described above, Defendant OFFICERS unlawfully detained Plaintiff without legal justification to do so.

95. Defendant OFFICERS acted willfully and wantonly in that they intended to violate, or were recklessly indifferent towards violating, Plaintiff's rights.

96. As a direct and proximate result of Defendant OFFICERS' misconduct, Plaintiff suffered damages, including emotional damages and a loss of liberty, which will be proven at trial.

   **WHEREFORE**, Plaintiff prays for a judgment against Defendant CITY in a fair and just amount sufficient to compensate him for his damages and such other relief as is just and equitable

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully submitted,

FABIAN BAEZ, Plaintiff

By: /s Torreya L. Hamilton
Attorney for Plaintiff

HAMILTON LAW OFFICE, LLC

14

53 West Jackson Boulevard, Suite 452
Chicago, Illinois 60604
312.726.3173
tlh@thehamiltonlawoffice.com
Attorney No. 6229397